UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


UNITED STATES OF AMERICA          :
                                  :
        v.                        :          1:19-mj-118-PAS
                                  :
PETER K. ZENDRAN                  :


**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

        Defendant Peter K. Zendran is charged with making threats of violence against a federal

judge and a federal law enforcement officer pursuant to 18 U.S.C. § 115(a)(1)(B) and 18 U.S.C.

§ 875(c).  An intelligent man whose adult life has nevertheless been characterized by chronic

homelessness and no employment and punctuated by repeated contacts with law enforcement,

judicial mental health referrals and involuntary mental health hospitalizations, Defendant is now

before the Court on the motion of the government challenging whether he is competent to stand

trial.  Weighing my own observations of Defendant and the evidence presented at a competency

hearing, including the evaluation report and testimony of a forensic psychologist, Dr. Shawn E.

Channell, as well as Defendant's testimony, I find that the government has sustained its burden

of demonstrating by a preponderance of the evidence that Defendant suffers from a mental

disease (Schizoaffective Disorder, Bipolar Type) that has rendered him unable to have a rational

understanding of the proceedings against him and that significantly impairs both his decision

making ability and his ability to assist in his defense.  Therefore, I recommend[1] that the Court

---

[1] "Whether a ruling on a motion to determine the competency of a criminal defendant to stand trial is dispositive or non-dispositive, pursuant to 28 U.S.C. § 636, is not well settled."  United States v. Nunez, No. 00-CR-199S, 2013 WL 1773627, at *1 n.1 (W.D.N.Y. Mar. 8, 2013), adopted, 2013 WL 1773583 (W.D.N.Y. April 25, 2013).  Some courts hold that a magistrate judge can resolve a competency motion, United States v. Ellis, No. 2:14-cr-33, 2020 WL 5363315, at *2 (N.D. Ind. Sept. 8, 2020); United States v. Shelton, Case No. 1:05-cr-00049-JJM, ECF No. 38

find Defendant suffers from a mental disease that renders him incompetent to stand trial and

order that he be committed to the custody of the Attorney General of the United States for

restoration pursuant to 18 U.S.C. § 4241(d).

I.     **BACKGROUND**

      A.     <u>**Charge, Initial Appearance and Motion for Competency Evaluation**</u>

On December 31, 2019, Defendant was arrested based on a criminal complaint supported

by an affidavit averring that he is "well known to law enforcement with numerous contacts" and

has a "history of psychiatric illness and court referrals for psychiatric treatment."  ECF No. 3-1 ¶

4.  The affidavit describes two videos that Defendant allegedly filmed of the victims' homes and

posted to YouTube on December 17, 2019; they contain offensive and threatening tirades

focused on the victims.  <u>Id.</u> ¶¶ 6-7.  In one of the videos, Defendant refers to one victim's link to

"that Tsarnaev case," which the affidavit explains is the "Boston Marathon Bombing

incident"[2]; as further background, the affiant avers that, during the Tsarnaev trial, Defendant

caused a disturbance and was removed after saying, "If I wanted to cause a disturbance, I would

just start killing people."  <u>Id.</u> ¶ 6.  In the other video, Defendant also referenced "Tsarnaev,"

saying, "Still think I don't know what I'm talking about that Tsarnaev event?  Crooked

Marshals and how they fucked up?"  <u>Id.</u> ¶ 7.

On the same day Defendant was arrested, counsel was appointed and Defendant was

brought to Court for his initial appearance.  Prior to the Court proceeding, Defendant was

interviewed by Pretrial Services in the presence of the assistant federal defender who was then

---

(D.R.I. Sept. 8, 2005), while others resolve competency based on a magistrate judge's recommendation.  <u>United States v. Figueroa</u>, Criminal No. 18-10022-ADB, 2018 U.S. Dist. LEXIS 200449, at *1 (D. Mass. Nov. 20, 2018); <u>Nunez</u>, 2013 WL 1773627, at *1 n.1.  In light of this unsettled state of the law, I choose the "more prudent[]" course of addressing the matter by report and recommendation.  <u>Id.</u>

[2] <u>See generally</u> <u>United States v. Tsarnaev</u>, 968 F.3d 24 (1st Cir. 2020).

representing him.[3]  Largely based on information provided by Defendant, the Pretrial Services

Report advised the Court and the parties that Defendant had been homeless, living since 2015

"on tribal lands in Washington County, Rhode Island," that he is "visually" disabled[4] and has

received disability benefits since 1998, and that he had just been released by Newport Hospital,

where he had been treated for physical and mental health conditions as a result of an arrest on

December 21, 2019, when Defendant caused a disturbance at a hotel in Newport, including

threatening to blow up the building.[5]  While he described receiving monthly care at Yale-New

Haven Hospital, Defendant told Pretrial Services that he has never been diagnosed with any

mental health condition; however, the Pretrial Services Report indicates that a cousin contacted

by the Pretrial Services officer stated that Defendant has a mental health condition that requires

ongoing care.

      As summarized in the Pretrial Services Report, Defendant has a lengthy criminal history

beginning in 2008 when he was 29 years old.  It includes thirteen misdemeanor convictions for

---

[3] At the initial appearance, Defendant was represented by an assistant federal defender.  Due to a conflict of interest, the Office of the Federal Defender withdrew, as did the first CJA attorney who was appointed.  ECF Nos. 9-11.  The CJA defense counsel presently representing Defendant was appointed on January 14, 2020.  ECF No. 12.  Similarly, the Office of the United States Attorney for the District of Rhode Island withdrew due to a conflict of interest; the prosecution of the case is now being handled by attorneys from the Office of the United States Attorney for the District of Connecticut, acting as "Special Attorney Under Authority Conferred."

[4] No clarifying information was provided to the Court regarding the nature of what Defendant said is a "visual" disability; nor was any accommodation relating to such a disability requested for Defendant in connection with the competency hearing.  Based on the Court's observation of Defendant during the competency hearing, it did not appear that a visual impairment impacted Defendant's ability to participate by video fully and effectively.  For example, at the beginning of the hearing, Defendant stated that he had prepared by organizing the documents relevant to the case, while during the hearing, he said he was able take detailed notes regarding what he described as inaccuracies, was able to locate and hold up to the camera portions of documents that he deemed relevant to the testimony, was effectively able to manage the "mute" function and was able to assist his attorney during the cross examination of Dr. Channell by calling out a pertinent page number.

[5] This characterization of the conduct underlying the charge that resulted in Defendant's hospitalization at Newport Hospital for physical and mental health concerns comes from the affidavit supporting the Criminal Complaint.  See ECF No. 3-1 ¶ 4.

repeated incidents of trespass, assault, disorderly conduct and destruction of property,[6] two

pending cases (one based on the recent incident at the hotel in Newport), many findings of

violations of court-ordered conditions, at least six court-ordered mental health referrals and

several no-contact orders, including two orders barring Defendant from any contact with Brown

University.[7]  Defendant's convictions and violations have resulted in many sentences of thirty

days to serve, two of ninety days to serve, one of nine months to serve and the rest suspended.

Except for 2009-10 and 2017, the criminal history reflects conduct bringing Defendant into

contact with the criminal justice system every year since 2008.  Defendant was 41 years old at

the time of his initial appearance.

   During the initial appearance, I observed that Defendant appeared long-haired, unkempt,

and disheveled.  As soon as Defendant was advised of his rights and the charges, the government

moved for a competency evaluation pursuant to 18 U.S.C. §§ 4241 and 4247.  As grounds for the

motion, the government relied on Defendant's history as reflected in the Pretrial Services Report

and the affidavit supporting the criminal complaint, and asserted that there is reasonable cause to

believe that Defendant may be suffering from a mental disease that renders him incompetent to

the extent that he is unable to understand the nature and consequences of the proceedings or to

assist properly with his defense.

   On behalf of Defendant, his assistant federal defender advised the Court that Defendant

objected to the competency evaluation; after a private consultation with Defendant, she further

informed the Court that Defendant had directed her to state that the issues related to his state

---

[6] Defendant's federal defender advised the Court that all of Defendant's convictions are for misdemeanors.  That appears to be accurate.

[7] As reflected in the Pretrial Services Report, none of the no-contact orders or criminal charges appears to be related to domestic or intra-family issues.

court cases were physical, not necessarily mental in nature (a statement that was squarely

contradicted by the Pretrial Services Report) and that he had been in touch with members of the

FBI in recent weeks and had provided her with their names.  Then, Defendant himself spoke: he

stated that he had provided his attorney with the names of people in Homeland Security and the

FBI who know him well and who are contacting him in regard to this matter, as well as that the

entire procedure would have been headed off if he had been allowed to speak to the FBI.[8]  In

speech that seemed to veer from topic to topic, Defendant also referred to a desk agent

(conceivably[9] at the hotel in Newport), a voicemail he was not allowed to leave and a shooting at

Babcock Village in Westerly, Rhode Island,[10] where his stepfather had been present, which

Defendant said he and others (including law enforcement) had anticipated and which Defendant

said he had taken very personally.  Defendant stated that the Babcock Village shooting was the

reason why he was put on observation during his recent hospitalization at Newport Hospital.

Based on the information in the Pretrial Services Report, my own observations of

Defendant, including both his disheveled and bizarre appearance and his statement to the Court

about the charges, as well as his seeming inability to provide his attorney with coherent

information pertaining to the matters in issue at the initial appearance, I granted the

government's motion, finding reasonable cause to believe that Defendant may presently be

[8] To this judicial officer, this statement seemed intended to suggest to the Court that the charges would be dismissed after the Court contacted these law enforcement officers because the charged conduct arose while Defendant was working with the FBI or Homeland Security in some capacity.

[9] This was my speculation as I heard this speech and tried to make sense of it.

[10] The Court assumed that this reference relates to an incident that occurred on December 19, 2019, when a resident "opened fire with a 38-caliber revolver" at the Babcock Village Apartments, killing one person and injuring two others.  See Police Analysis Gives More Details of Babcock Village Shooting, Investigation, https://www.thewesterlysun.com/news/westerly/police-analysis-gives-more-details-of-babcock-village-shooting-investigation/article_2ccaf7e2-3bd9-11ea-85b5-67494f8ed8c5.html (last visited December 30, 2020).

suffering from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.  ECF No. 7.  I ordered that Defendant be committed to the custody of the Attorney General for placement in a suitable facility for conducting a competency evaluation.  Id.; see 18 U.S.C. § 4247(b).  To ensure that the evaluation was conducted as promptly as possible, I ordered the government to present the Court with a status report every thirty days.  ECF No. 7 at 2.

Unfortunately, due to the unavailability of a bed, Defendant did not arrive at the Federal Medical Center in Devens, Massachusetts, ("FMC Devens") until early March, shortly before the declaration of the National Emergency arising from the COVID-19 pandemic.  After his arrival, the Court was advised that Dr. Channell had been assigned to perform Defendant's forensic evaluation, which was expected to be completed by April 11, 2020, and that Dr. Channel's report could be expected in June.  However, in May and at a status conference ordered by the Court in June (because of concern about delay), the Court was advised that, due to the many consequences caused by the COVID-19 pandemic, exacerbated by Defendant's refusal to wear a mask when Dr. Channell attempted to speak with him, the report would not be completed until August at the earliest.  Throughout this period of delay, Defendant's attorney and the government maintained close communication and Dr. Channell had frequent contact with both attorneys in his effort to procure information for his evaluation.

Ultimately, Dr. Channell was able to complete the Court-ordered competency evaluation; the Court received his report on October 1, 2020, and immediately scheduled the competency hearing pursuant to 18 U.S.C. §§ 4241 and 4247 to be conducted by video[11] on October 13,

---

[11] As of October 2020, this Court was operating under the declaration of the COVID-19 emergency and was physically closed, although, with guidance from a consulting epidemiologist, the Court had begun to permit limited matters to be conducted in-person while using extreme precautions.

2020.  ECF No. 19; Oct. 6, 2020 Notice of Hearing.  The parties responded with a motion to continue the competency hearing, at the request of Defendant for religious observation and at the request of the government based on the unavailability of Dr. Channell.  See ECF No. 20. Instead, on October 13, 2020, the Court held a conference with counsel who concurred that a competency hearing must be in-person and that such a hearing is not covered by the CARES Act provision that permits a hearing by video with consent.  See generally Coronavirus Aid, Relief, and Economic Security Act § 15002(b), Pub. L. No. 116-136, § 15002(b), 134 Stat. 281, 528-530 (Mar. 27, 2020).  Accordingly, the Court worked closely with the Clerk's Office to develop protocols to allow the competency hearing to be conducted safely in-person despite the pandemic.  On October 19, 2020, the Court issued a Memorandum of Instructions establishing safety protocols and scheduled the in-person hearing for the next date when a safe space with adequate ventilation could be made available – November 20, 2020.  ECF No. 21; Oct. 23, 2020, Notice of Hearing.

Again, the pandemic intervened.  The severe COVID-19 surge that began in late October resulted in the cancellation of the Court's limited reopening in October and a directive by the Chief Judge of the District of Rhode Island that judicial officers must refrain from conducting hearings in-person and must rely on video until it again becomes possible to conduct in-person hearings safely.  ECF No. 24.  Based on specific findings about the danger of an in-person hearing, as well as the Court's positive experience with remote hearings, which have been "extremely effective[]," the Court found that the situation had become an "extreme case[] where alternative measures [were] needed to protect the safety of the participants to the hearing," and cancelled the in-person hearing and ordered that the hearing proceed by video with all parties

and witnesses appearing remotely.  Id.; see United States v. Frierson, 208 F.3d 282, 287 n.9 (1st

Cir. 2000).  Defendant did not object to this Order.

     **B.**       **Evidence Presented at the Competency Hearing**

     At the public competency hearing conducted remotely on November 20, 2020, the

government presented Dr. Channell's Forensic Mental Health Evaluation, which was admitted

full as Exhibit A ("Channell Evaluation"), and the testimony of Dr. Channell, while Defendant

relied only on his own testimony.  Dr. Channell presented his educational background, board

certification, extensive experience (including more than a thousand competency evaluations),[12]

and the methods he used to perform Defendant's evaluation, based on which the Court found him

qualified to testify regarding his opinions as an expert.  Defendant did not object to Dr.

Channell's qualifications to testify as an expert; nor did he present any expert testimony or other

opinion evidence.

     In the Evaluation and during Dr. Channel's testimony, he described not just his own

clinical observations and interviews of Defendant, which were reflected in his notes, but also his

reliance on the observations and notes made by other mental health professionals, medical

providers and correctional officers at FMC Devens.  During the hearing, Defendant's oral motion

for prompt production of this material was granted and, at Defendant's request, the Court ruled

that the record would be held open until 5:00 p.m. on December 9, 2020, to permit Defendant to

present any additional evidence or arguments after review of these materials.  December 9 has

---

[12] Dr. Channell estimated that seventy-five percent of the time, his competency evaluation results in the opinion that the defendant is competent.

come and gone; nothing was presented.[13]  Therefore, as of December 10, 2020, the competency

record closed and the matter was taken under advisement.

The Channell Evaluation is an eleven-page single-spaced detailed exposition of Dr.

Channel's conclusions and his methods and procedures.  These include testing, Dr. Channell's

own observations and clinical interviews, his reliance on the observations of others, and his

reliance on such information as he was able to procure regarding Defendant's personal, criminal

and health history from Defendant himself, from the attorneys (including defense counsel), from

law enforcement and from public databases.  In reliance on these methods and procedures and

based on the diagnostic criteria in the Diagnostic and Statistical Manual of Mental Disorders –

Fifth Edition, Dr. Channell opined that Defendant suffers from untreated Schizoaffective

Disorder, Bipolar Type.  Exh. A at 9.  Regarding Defendant's ability to stand trial, Dr. Channell

concluded that Defendant's mental illness, which causes him to maintain delusional beliefs about

an array of matters, including the incident that led to his arrest, "significantly impairs his

decision making about how to proceed with his case" and "interfere[s] with his ability to work

meaningfully with his attorney." Id. at 10-11.  Regarding Defendant's prognosis, Dr. Channell

opined that, without treatment, which he did not expect Defendant to accept voluntarily, it is

poor; with treatment, it is guarded. Id. at 9-10.  He recommended that Defendant be committed

for further evaluation and treatment for restoration pursuant to 18 U.S.C. § 4241(d), which would

include stabilization on medication.  The Channell Evaluation closes with the caution that

Defendant has no insight into his mental illness and is not currently accepting (indeed has

[13] During an off-the-record conference with counsel held on December 1, 2020, defense counsel advised that all materials had been produced to him and no additional filing was planned.

declined) recommended treatment by the administration of antipsychotic medication so that involuntary treatment may be necessary.  Id. at 11.

While the Channell Evaluation is lengthy and very detailed, as supplemented by Dr. Channell's testimony, several matters stand out.

First, throughout his stay at FMC Devens, consistent with the description of him that emerges from records spanning many years, Defendant presented as angry and hostile with other inmates, staff, medical professionals and Dr. Channell himself.  Exh. A at 7-9.  He refused to provide background information, often refused to respond to questions, refused to sign releases and refused medication recommended to address his mental health issues.  Id. at 2, 7-9.  Clinical testing confirmed that Defendant suffers from hostility and suspiciousness, with poor anger management skills and low frustration tolerance (including the holding of grudges for the slightest perceived mistreatment), as well as that he is unmotivated for mental health treatment. Id. at 9.  Consistent with the physical descriptions in the record and with my own observation during the initial appearance, while at FMC Devens, Defendant maintained a disheveled and unkempt appearance, including uncut hair and bizarrely long fingernails.  Id. at 7.

Second, Defendant's statements and the records reviewed by Dr. Channell reveal a stark dichotomy between Defendant's stated beliefs and objective reality.[14]  By way of just one example, Defendant told Dr. Channell that he had been employed as a department fellow at Brown University and was a lecturer at other universities (as clarified by his testimony, Defendant claims to have been a speaker at MIT, Harvard and NYU).  Exh. A at 3.  These beliefs contrast with the objective record reflecting that Defendant has been persistently homeless and

---

[14] On cross examination, Dr. Channell agreed that some of Defendant's beliefs may well be rooted in some truth but that, because such truths were eclipsed by the delusional nature of other statements, as well as because of the limits posed by Defendant's refusal to provide requested information, Dr. Channell did not attempt individually to investigate the truth of every statement Defendant made.

collecting disability benefits, has a high school education, was twice court-ordered to stay off the premises of Brown University,[15] was twice directed by MIT campus police to leave campus and stay away due to disruptive and rude behavior and was arrested, hospitalized and involuntarily medicated following an incident on a University of Rhode Island bus.  Exh. A at 3, 5-6

Third, contrasting with Defendant's stated belief that he suffers no current mental health issues and had never been diagnosed with a mental health condition is the objective medical record reflecting a pattern of repeated hospitalizations, many involuntary, for mental health symptoms.  Exh. A at 4-7.  By way of just three examples, the medical records Dr. Channell reviewed from Westerly Hospital reflect that, in 2013, Defendant was brought to the emergency room based on a treating psychiatrist's observation of homicidal ideation, while in December 2014 through January 2015, Defendant was committed to Fatima Hospital for two weeks, returned to Westerly Hospital soon after his release from Fatima complaining of chest pain, and was referred to South Shore Mental Health for a mental health evaluation, from which he was taken to Butler Hospital (an exclusively mental health facility) in an ambulance.  Exh. A at 5-6. And, in December 2019, following his arrest at the hotel in Newport, Defendant was hospitalized for six days, involuntarily placed on anti-psychotic medication and diagnosed with Undifferentiated Schizophrenia.  Id. at 7.  According to the record reviewed by Dr. Channell, evaluating clinicians at Newport Hospital noted that Defendant had no insight into his mental health issues.  Id.

Fourth, among other fixations, Defendant has perseverated on the Boston Marathon bombing and his belief that he knew Tamerlan Tsarnayev well and had been asked by law

---

[15] For example, on one occasion at Brown University, the record reviewed by Dr. Channell reflected that Defendant, smelling of a "very strong body odor," reentered the campus and insisted on seeing the Dean in defiance of a trespass order, was argumentative and assaulted an officer.  Following this arrest, he was referred for mental health treatment.  Exh. A at 4.

enforcement to assist with the Tsarnayev case.  Exh. A at 4-10.  At Defendant's request, Dr. Channell interviewed a Secret Service agent who Defendant insisted would confirm this belief. The agent did not confirm Defendant's belief; instead, the agent advised Dr. Channell that Defendant suffered from the fixation that he was intertwined with the Boston Marathon bombing and was in partnership with law enforcement.  Exh. A at 4-5.  The agent described his own observations that Defendant "talk[ed] fast," "would get fixated on things," had been "committed [to a hospital] occasionally," and was often "homeless and wandering around in the winter with no jacket."  Id.  The agent summarized: "I've never seen him where he's got it together."  Id. at 5.

Fifth, the historic record as summarized by Dr. Channell makes clear that the symptoms that form the basis for Dr. Channell's diagnosis – paranoid and grandiose delusions, euphoric mood, increased energy, excessive and rapid speech, poor judgment and impulsive behavior – have persisted seemingly without remission throughout the period (beginning in 2008 to the present) for which Dr. Channell was able to procure records.  Focusing on this long period of untreated illness and mindful of Defendant's diagnosis, Dr. Channell opined that, without psychotropic medication (which Dr. Channell strongly recommended but considered unlikely to be taken voluntarily), Defendant's mental health symptoms are likely to persist and possibly worsen.  Id. at 8-10.

On cross-examination, Dr. Channell confirmed that, although he was aware of Defendant's ability to explain the charges against him, he did not directly ask Defendant to define the role of the participants (judge, jury, attorneys) in a criminal case because Defendant refused to respond to direct questions.  Dr. Channell clarified that Defendant's ability accurately to define these roles would not alter his opinion in that it would reflect only a factual

understanding, but not a rational understanding and not the ability to assist counsel in his defense. Relatedly, during cross-examination, Dr. Channell testified that he was generally aware of Defendant's filing of *pro se* civil cases in the Rhode Island Superior Court and that Defendant's ability to file and prosecute these cases also had been taken into account in forming his opinion. In that regard, Dr. Channell noted that, in his experience, it is not uncommon for a psychotic individual to succeed in filing *pro se* cases although the content is irrational and not founded in reality. He emphasized that he had found Defendant to be an intelligent man, so that it is not surprising that Defendant can understand the judicial system, learn judicial procedure, file *pro se* civil cases,[16] and occasionally represent himself in a low-level criminal cases,[17] yet he lacks a rational understanding of the felony charges pending in this Court and does not possess the ability to provide meaningful assistance in his defense in this case. Relatedly, Dr. Channell noted that medical records reflecting that Defendant has been able to seek physical treatment at various hospitals do not reflect rational decision-making; instead, they largely reflect Defendant's irrational decision-making, for example in driving himself to the point where he damaged his feet and became dehydrated from walking for miles and miles.

In closing, Dr. Channell testified that, despite the challenges he faced in preparing the Evaluation of Defendant, he believes he had more than sufficient information to form his opinion

---

[16] During cross examination, Defendant's attorney asked Dr. Channell about a 2004 case that Defendant filed in this Court; Dr. Channell testified that he knew about Defendant's Superior Court *pro se* cases but was not aware of a federal civil case. Because the 2004 federal case is a matter of public record, I reviewed the operative decisions. They confirm that Defendant's understanding of judicial procedure was sufficient for filing and prosecuting this *pro se* case all the way to the United States Supreme Court; as pertinent to competency, however, Defendant's legal effort is consistent with Dr. Channell's testimony, in that he met with defeat at every phase. Zendran v. Providence Police Dep't, C.A. No. 04-455ML (D.R.I. October 5, 2005) (dismissing complaint), aff'd, No. 05-2660 (1st Cir. June 12, 2006), cert. denied, 549 U.S. 1079 (2006), rehearing denied, 549 U.S. 1247 (2007).

[17] Defendant testified that he was occasionally successful in self-representation in criminal matters. Confirming this testimony is the Pretrial Services Report, which reflects that, once in 2014 and once in 2016, charges of disorderly conduct were dismissed.

regarding competence.  Regarding the ongoing viability of his opinion to the present, Dr.

Channell testified that Schizoaffective Disorder is a chronic illness that rarely remits without

treatment.  Based on his understanding that there has been no treatment, Dr. Channell opined

that, despite the passage of a few months since he completed the Evaluation, it is highly unlikely

that Defendant is now competent; rather, Dr. Channell testified that he expects that incompetence

has persisted and will persist unless treatment is provided.

Defendant's presentation in opposition was limited to his own testimony.  The Court

observed that, while he continued to have long unkempt hair and bizarrely long fingernails,[18]

Defendant's physical appearance was markedly better from how he appeared almost nine months

earlier, during his initial appearance.  The Court also observed that Defendant was engaged and

behaved appropriately throughout the two-and-a-half-hour hearing.  He was able courteously to

answer his attorney's questions and those of the prosecutor on cross examination.  His answers

were coherent and generally responsive to the questions.

As to substance, Defendant testified that he disagrees with Dr. Channell's opinion of

incompetence, that he found the Channell Evaluation to have many inaccuracies and false

statements and that he believes that he can reasonably and rationally assist his attorney.

Regarding his understanding of the proceedings, Defendant testified that he has been

evaluated for competency by the State on at least four occasions, in 2001, twice in 2012 and in

2015.  As described by Defendant, these evaluations consisted of little more than asking him to

explain his understanding of the judicial process, including the role of the judge and jury, an

---

[18] The latter issue was subsequently addressed as a health and safety matter.  ECF No. 28 (sealed to protect privacy).

exercise at which he is adept.[19]  Although his testimony was inconclusive regarding what opinions were formed as a result of these evaluations and no evidence was proffered of the actual opinions, based on the large number of convictions in Defendant's criminal history, the Court assumes that misdemeanor prosecutions generally were allowed to proceed.[20]  As further evidence of his understanding of court proceedings, Defendant testified that he has filed many *pro se* civil cases and that he represented himself in connection with some of the criminal prosecutions.

Regarding Dr. Channell's opinion that Defendant's beliefs about the Tsarnayev brothers and his partnership with the FBI and Homeland Security are delusional, Defendant said that he had given Dr. Channell the names of others in law enforcement, not just the name of the Secret Service agent who was interviewed by Dr. Channell.  However, no evidence was presented to suggest that other officials might provide information different from what the Secret Service agent told Dr. Channell.  Further, Defendant's own testimony confirmed that he is unshaken in his firmly held belief that he partnered with law enforcement on the Boston Marathon case by providing information that only he knew about the Tsarnayev brothers.  Regarding Dr. Channell's opinion that Defendant's belief that he has been employed at Brown University and a speaker at various universities is delusional, Defendant described himself as a scholar of Ghengis Khan and explained that he wrote a book about Iran that was on sale at the Harvard Book Store until October 2012; he stated that he has discussed Ghengis Khan with a professor who used to

---

[19] During his direct examination, Defendant demonstrated his ability to answer these questions in that he was successfully able to explain the charge against him and was able accurately and clearly to explain the role of the judge, jury, defense attorney and prosecutor in a criminal case.

[20] While questions of counsel are not evidence, the Court notes that, during cross examination of Dr. Channell, defense counsel asked Dr. Channell if he was aware that a Dr. Barry Wall, acting on behalf of the State, had found Defendant competent in 2008.  In response, Dr. Channell testified that he was not aware of such an evaluation but that a finding in 2008 that Defendant was competent for some purpose would not alter his opinion regarding competence in connection with this case in 2020.

teach at Brown University and is a long-time friend.  However, this professor did not testify or provide any corroboration of Defendant's belief, nor was any other corroboration offered.

Although Defendant is critical of Dr. Channell's Evaluation as based on incomplete information and misunderstandings,[21] Defendant conceded that he had refused to sign releases that would have permitted Dr. Channell to get more information.  Instead, he claimed to have been working closely and directly with his attorney to get additional information to contradict the foundations for the opinion in the Evaluation.  However, no additional evidence was presented. In addition, the record establishes that defense counsel was actively involved with Dr. Channell as he was gathering information for the Evaluation and has been in frequent communication with Defendant since he returned to the Wyatt Detention Facility.  Throughout the competency proceedings, defense counsel aggressively and appropriately presented Defendant's position that he is competent.  However, no separate representation of counsel regarding competency was proffered.

## II.    APPLICABLE LAW

"It has long been held that the conviction of an accused person legally incompetent to stand trial violates due process."  Johnson v. Norton, 249 F.3d 20, 26 (1st Cir. 2001) (citing Pate v. Robinson, 383 U.S. 375, 378 (1966)).  As the Supreme Court has held in its seminal decision in Dusky v. United States, 362 U.S. 402 (1960), it is not enough for the court to find that the defendant is oriented to time and place and has some recollection of events; the test is whether he

---

[21] One apparent misunderstanding did emerge.  It involved "Katherine Anne Power."  During the evaluation, Defendant asked Dr. Channell if he knew of Ms. Power and became outraged when Dr. Channell said he did not; Defendant confirmed that he was outraged by such ignorance during his testimony at the competency hearing.  In his report, Dr. Channell speculates that Defendant was referring to a notorious bank robber from 1970 named Katherine Ann Power.  Exh. A at 8.  On direct examination, Defendant explained that he meant a different Katherine Anne Power, one who was involved in the State of Rhode Island mental health system.  What is clear to the Court is that this misunderstanding is beside the point; Dr. Channell raised the incident to highlight Defendant's inappropriately intense emotional reaction.

has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him.  Id. at 402.  "The deep roots and fundamental character of the defendant's right not to stand trial when it is more likely than not that he lacks the capacity to understand the nature of the proceedings against him or to communicate effectively with counsel" is of constitutional proportions.  Cooper v. Oklahoma, 517 U.S. 348, 368 (1996).

As laid out in 18 U.S.C. § 4241, the Court must determine two issues: first, whether Defendant is "presently suffering from a mental disease or defect"; second, if he is, whether that mental disease or defect renders him either "mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him" or impairs his ability "to assist properly in his defense."  18 U.S.C. § 4241(d); see United States v. Maldonado, 708 F.3d 38, 45 (1st Cir. 2013) (competency requires that the defendant have ability to comprehend nature of proceedings and to assist counsel in preparing his defense); United States v. Brown, 669 F.3d 10, 17 (1st Cir. 2012) ("test for competency is whether the defendant first has sufficient present ability to consult with counsel with a reasonable degree of rational understanding, and second has a rational and factual understanding of the proceedings against him").  Because this is a "functional inquiry," it is possible for a defendant to have a serious mental illness but still be able to understand the proceedings and rationally assist counsel.  United States v. Widi, 684 F.3d 216, 220-21 (1st Cir. 2012).  The inquiry into competency is "intensely fact based," United States v. Mahoney, 717 F.3d 257, 266 (1st Cir. 2013) (internal quotations marks omitted), and is "often a difficult one in which a wide range of manifestations and subtle nuances are implicated."  Drope v. Missouri, 420 U.S. 162, 180 (1975).  The critical question is the "present

ability" of a defendant – not the ability at some time in the past or future.  United States v. Thomas, 519 F. Supp. 2d 135, 141 (D. Me. 2007) (quoting Drope, 420 U.S. at 173).

To determine competency, "[c]ourts have considered such factors as: whether the defendant understood the nature of the charges and the differences, if any, among the charges, whether the defendant understood the roles of the judge, jury, and lawyers; and the defendant's apparent ability to consult with his attorney." Id. at 140-41.  A judge may take into account her own observations of a defendant.  Widi, 684 F.3d at 220.  A defendant's insistence on his competency is also entitled to consideration – unless it is "plainly incoherent or irrational." Id. Defense counsel's "conclusion of competence is generally given great weight because of counsel's 'unique vantage.'"  Id. (quoting United States v. Muriel-Cruz, 412 F.3d 9, 13 (1st Cir. 2005)).[22]  A clinician's view is also entitled to weight – "even if his examination was handicapped by [a defendant's] refusal to cooperate." Id.

Since the Supreme Court's decision in Cooper, 517 U.S. at 362, a judicial consensus has emerged that the competency determination must be based on a preponderance of the evidence; however, courts have struggled with who bears the burden of proof in a case where the defendant claims to be competent, but the government alleges incompetence.  Agreeing with the unreported report and recommendation of a magistrate judge from the District of Massachusetts, United States v. Antonenko, Criminal No. 20-10102-WGY, ECF No. 79 (D. Mass. Sept. 8, 2020), adopted, ECF No. 80 (Sept. 29, 2020), I find most persuasive the cases holding that the burden must lie with the party making the motion.  E.g., United States v. Fannin, Criminal Action No.

---

[22] Although doubt expressed by counsel concerning a client's competence is "unquestionably a factor which should be considered," a court need not "accept without question a lawyer's representation concerning the competence of is client." Drope, 420 U.S. at 177 n.13; see also Medina v. McGinnis, No. 04-Civ.2515 SHS AJ, 2004 WL 2088578, at *14 n.32 (S.D.N.Y. Sept. 20, 2004) (counsel's opinion is a factor but it does not serve as a substitute for the court's discretion).

7:17-CR-03 (KKC), 2017 WL 5451751, at *2 (E.D. Ky. Nov. 14, 2017) (§ 4241 indicates that party who raises competence has burden); United States v. Rothman, No. 08-20895-CR, 2010 WL 3259927, at *6 n.4 (S.D. Fla. Aug. 18, 2010). As the court held in United States v. Holmes, 671 F. Supp. 120 (D. Conn. 1987), aff'd, 867 F.2d 1425 (2d Cir. 1988):

> In the atypical case where, as here, the defendant himself argues that he is competent to stand trial, it would appear nonsensical to ask the government, which believes him to be incompetent, to bear the burden of proving his competence. Instead the government's burden must logically be that of proving its position on the competency issue by a preponderance of the evidence.

Id. at 123 n.7. Consistent with the holdings of these cases, the parties in this case agree that, as the movant, the government must prove Defendant's incompetence by a preponderance of the evidence. Accordingly, my recommendation rests on the proposition that it is the government that must shoulder the burden.

## III.    PROPOSED FINDINGS AND RECOMMENDATIONS

I find that Dr. Channell is a well-qualified expert whose testimony was credible and whose Evaluation is persuasive and entitled to great weight. See Muriel-Cruz, 412 F.3d at 13 ("clinical opinion of the [Federal Medical Center's] psychiatric personnel" is "competent evidence") (citing United States v. General, 278 F.3d 389, 398 (4th Cir. 2002) (in making competency determination, "the [FMC] report is entitled to significant weight")). In reliance on this unrebutted psychological evidence, I find that the government has amply sustained its burden of demonstrating by a preponderance of the evidence that Defendant suffers from untreated Schizoaffective Disorder, Bipolar Type, and that the symptoms of this mental disease render him incompetent to the extent that he suffers from delusional beliefs that significantly impair his decision making about how to proceed with his case and his ability to assist his attorney with his defense. While Defendant has demonstrated that he is intelligent and possesses

a well-developed factual understanding of court procedures, enabling him to file *pro se* cases, to

represent himself during state court criminal proceedings and accurately to recite the roles of the

players in a criminal case, for the reasons explained by Dr. Channell, I find that these capabilities

do not impact the core finding of incompetence arising both from his lack of a rational

understanding of the charge, defense options and strategies in the circumstances presented here

and his resulting inability to assist in his defense in a meaningful way.  See United States v.

Crawford, No. CV407-284, 2008 WL 858902, at *3 (S.D. Ga. Mar. 31, 2008) (defendant found

incompetent due to schizophrenia despite having written clear and cogent letters to establish

competence; examining psychologist testified that schizophrenics commonly exhibit logical and

goal-oriented thought processes); United States v. Rodman, 446 F. Supp. 2d 487, 493-94 (D.S.C.

2006) (due to bipolar type schizoaffective disorder, defendant has delusions that are intimately

connected with substance of charge; despite adequate factual understanding of charges and court

procedures, defendant found not competent to stand trial); United States v. Nagy, No. 96 CR.

601(RWS), 1998 WL 341940, at *5, 7 (S.D.N.Y. June 26, 1998), aff'd, 173 F.3d 847 (2d Cir.

1999) (defendant with psychotic paranoia and grandiosity that impairs his sense of reality has

factual understanding of complaint, indictment and roles of lawyers and judge, but that is

insufficient to support finding of competency if defendant cannot assist properly in his defense).

The principal evidence in favor of competency is Defendant's vehement disagreement

with Dr. Channell's opinion that he is not competent to proceed to trial.  Widi, 684 F.3d at 220

(defendant's insistence on competency entitled to consideration).  However, Dr. Channell

considered Defendant's perspective and made it a focus of his testing and observation.  Dr.

Channell also noted and considered, *inter alia*, the recently formed (2019) opinions of the mental

health professionals at Newport Hospital (Exh. A at 7, "no insight into his mental health issues"),

and at Yale-New Haven Health (Exh. A at 6, "denied current mental health issues").  All of these sources undergird Dr. Channell's conclusion that Defendant's denial of mental health issues is one of the symptoms of Defendant's illness.  Therefore, I find that Defendant's perspective regarding his illness and its impact on his ability competently to proceed to trial is entitled to minimal weight as it is "plainly incoherent or irrational."  Widi, 684 F.3d at 220.

The only other evidence contrary to incompetency is the Court's own observation during the competency hearing that Defendant was actively and energetically engaged and able to maintain a courteous and appropriate affect and to testify responsively and largely coherently. However, this observation is not inconsistent with Dr. Channell's Evaluation, which described Defendant as oriented to person, place, time and circumstances, with average intelligence and fund of knowledge and no noteworthy mannerisms or gestures, whose symptoms include euphoric mood and increased energy.  Exh. A at 8-9.  Importantly, Dr. Channell did not opine that Defendant lacks the ability to communicate effectively.  To the contrary, the essence of Dr. Channell's opinion, which was corroborated by Defendant's testimony, is that Defendant harbored and continues to harbor delusional beliefs, *inter alia*, about the circumstances underlying the charges (including the belief that he was acting in connection with a partnership with law enforcement related to the Boston Marathon case), which render him incapable of making rational decisions about the charges and interfere with his ability to assist his attorney in a meaningful way with his defense.  Exh. A at 10-11.  Mindful that I lack the professional expertise to substitute my own diagnosis based on my observations over a few hours for that of Dr. Channell developed over weeks of observation by himself and others trained to make such observations, I decline to afford substantial weight to my impressions.  See United States v. Schlueter, 276 F. App'x 81, 83-85 (2d Cir. 2008) (because defendant diagnosed with

21

schizoaffective disorder was highly intelligent and actually did assist in his defense, court assumes that, if he testified, defendant would have been able "at that moment" to assist his counsel, but nevertheless finds that testimony of government's expert and lack of contradictory expert testimony amply support finding that illness significantly impaired ability to assist properly in defense). It certainly is not enough to tip the preponderance in favor of a finding of competence.

## IV.    CONCLUSION

Based on the forgoing, I recommend that the Court find that the preponderance of the evidence establishes that Defendant presently suffers from a mental disease (Schizoaffective Disorder, Bipolar Type) that renders him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense. In reliance on that finding, I further recommend that Defendant be committed to the custody of the Attorney General, who should be directed to hospitalize Defendant for treatment in a suitable facility for such a reasonable time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit trial to proceed. 18 U.S.C. § 4241(d). Finally, based on Defendant's expression of discomfort at FMC Devens, in contrast to his more positive experience at the Wyatt Detention Facility, I encourage the Bureau of Prisons to consider hospitalization of Defendant at another facility pending further study pursuant to § 4241(d). See Crawford, 2008 WL 858902, at *4.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes

waiver of the right to review by the district judge and the right to appeal the Court's decision.

See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v.

Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 30, 2020